UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROY FOREST, JR.                                        CIVIL ACTION

VERSUS                                                 NO. 11-2017

MICHAEL J. ASTRUE, COMMISSIONER               SECTION "I" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Roy Forest, Jr., proceeding pro se, seeks judicial review pursuant to

Section 405(g) of the Social Security Act (the "Act") of the final decision of the

Commissioner of the Social Security Administration (the "Commissioner"), denying

plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42

U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge

pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2(B).

I.    PROCEDURAL HISTORY

Forest filed his application for DIB on June 17, 2009, alleging disability since June

1, 2007, due to right hip and left knee pain, stroke, hypertension, sleep apnea and

memory loss. (Tr. 130-33, 159). After his application was denied at the agency level,

he requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

March 10, 2010. (Tr. 74-84). On April 29, 2010, the ALJ issued a decision denying

plaintiff's application for benefits. (Tr. 14-25). The Appeals Council denied review on

April 29, 2011 (Tr. 6-8), but set aside its decision to consider additional information. (Tr. 5-6). After considering the additional information, the Appeals Council again denied review on June 24, 2011, and the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 1-3).

Rather than filing a memorandum of facts and law, as ordered by the court, Record Doc. No. 14, plaintiff filed a motion for summary judgment. Record Doc. No. 15. Defendant filed a timely reply memorandum. Record Doc. No. 18.

II.    STATEMENT OF ISSUES ON APPEAL

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ failed to apply the correct legal standard when determining that plaintiff's impairments did not meet or equal Listing 1.02(A) for major dysfunction of a weight-bearing joint.

B.    The ALJ erred by failing to obtain an updated medical expert opinion regarding medical equivalency.

C.    Substantial evidence does not support a finding that plaintiff can perform sustained work activities.

D.    The ALJ failed to apply the correct legal standard when determining plaintiff's residual functional capacity and the ALJ's finding is not supported by substantial evidence.

III. ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL

The ALJ made the following relevant findings:

1.  Plaintiff has severe impairments consisting of osteoarthrosis[1] and hypertension.

2.  He does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.

3.  Forest has the residual functional capacity to perform light work, except that he must be able to shift from sitting to standing at will. He can occasionally crouch and climb stairs and ramps. He cannot climb ladders or ropes, kneel, crawl or operate foot controls with his left foot. He is precluded from exposure to extreme heat or cold.

4.  Although plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, his statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

5.  Forest cannot perform his past relevant work as a bus mechanic, which was skilled work performed at the medium exertional level.

6.  He has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy that he is capable of performing, such as a semiskilled assembler and an unskilled counter clerk and information clerk.

(Tr. 16-17, 21, 23-24).

---

[1] Osteoarthrosis is another word for osteoarthritis, which is a noninflammatory degenerative joint disease. Dorland's Illustrated Medical Dictionary 1286 (29th ed. 2000) (hereinafter "Dorland's").

IV.    ANALYSIS

A.    Standards of Review

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Waters v. Barnhart, 276 F.3d 716, 716 (5th Cir. 2002); Loza v. Apfel, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Perez, 415 F.3d at 461; Loza, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues de novo or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether

substantial evidence supports it.  <u>Perez</u>, 415 F.3d at 461.  Any findings of fact by the

Commissioner that are supported by substantial evidence are conclusive.  <u>Id.</u>; <u>Newton</u>,

209 F.3d at 452; <u>Martinez v. Chater</u>, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for SSI or DIB,[2] plaintiff must show that

he is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations

that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§

404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2008).  The regulations

include a five-step evaluation process for determining whether an impairment prevents

a person from engaging in any substantial gainful activity.  <u>Id.</u> §§ 404.1520, 416.920;

<u>Perez</u>, 415 F.3d at 461; <u>Waters</u>, 276 F.3d at 716; <u>Loza</u>, 219 F.3d at 393.[3]  The five-step

---

[2]The relevant law and regulations governing a claim for DIB are identical to those governing a claim for SSI.  <u>Greenspan v. Shalala</u>, 38 F.3d 232, 236 (5th Cir. 1994); <u>Hollis v. Bowen</u>, 837 F.2d 1378, 1382 n.3 (5th Cir. 1988).

[3]The five-step analysis requires consideration of the following:
First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).
Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  <u>Id.</u> §§ 404.1520(c), 416.920(c).
Third, if an individual's impairment has lasted or can be expected to last for a continuous period

inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled. Perez, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry. If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing. When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding. Id.; Newton, 209 F.3d at 453.

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions

---

of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence. Id. §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated. If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled. Id. §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy. If the claimant cannot meet the demands, he or she will be found disabled. Id. §§ 404.1520(f)(1), 416.920(f)(1). To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns. When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled. Id. § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 ("Medical-Vocational Guidelines").

of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history." Martinez, 64 F.3d at 174.

B.    Factual Background

Forest testified that he was born in 1956, is married, and lives with his wife and mother in a house that they own. He said he is right-handed, stands five feet seven and one-half inches tall and weighs 261 1/2 pounds, up from his usual weight of 245 pounds. He attributed his weight gain to inactivity and inability to do things around the house. (Tr. 39-40). He stated that he finished high school and attended two years of trade school for carpentry, but did not finish the training. He testified that he can read, write and perform basic math. He never served in the military. (Tr. 40-41).

Plaintiff stated that he worked for New Orleans Public Service, which became the Regional Transit Authority, for 29 1/2 years until he retired in July 2007. He said he receives retirement benefits of $1,800 per month, but that $300 per month "goes to my wife in case I die . . . so that she would continue getting my retirement." He testified that he received back earnings of $2,500 after his retirement date in a single lump sum check, which reflected earnings from the time period after Hurricane Katrina in 2005 when he was on loan to Roger Penske. He said that the union had to fight for the mechanics to receive that lump sum pay. (Tr. 41-44).

Forest testified that he retired in the summer of 2007 because one of the men he worked with left the company, he was then on a skeleton crew and he could no longer do the heavy lifting by himself. He said he also retired because of Hurricane Katrina and having his 85-year old mother live with him so he could take care of her. He stated that he has not tried to work anywhere since retiring. (Tr. 44-45).

Plaintiff said that his right leg is smaller than his left and is weak throughout. He testified that his right hip hurts daily, even when sitting, and that he walks with a limp. He said that he gets pains in his legs, ankles and right hip if he does any heavy lifting. (Tr. 45). He stated that the pain feels like someone is pushing and twisting something in his hip and tailbone area.

Forest testified that his right ankle causes his right foot to "drag and flap" at the toe and heel when he walks. He said that the ankle does not bend properly. (Tr. 46). He stated that he has degeneration in both knees, but has more pain in the left knee, on which he had arthroscopic surgery about a year before Hurricane Katrina. He said he went back to the doctor after the surgery because his knee still hurt and the doctor told him the only thing he could recommend was a total knee replacement. (Tr. 47). Plaintiff testified that he has terrible, twisting pain in his left knee, which hurts when he walks on concrete or the weather is cold. He said he does not have any pain in his right knee, but it is "slip-jointed," meaning that it "pops back sometimes." (Tr. 47-48).

Plaintiff stated that he had physical therapy at Tulane Medical, but stopped going in December 2009 because he began receiving bills, was not sure if his insurance was going to pay for it and could not afford to pay for it himself. (Tr. 48). He testified that his high blood pressure is controlled by medication. He stated that he has sleep apnea, which is helped by his use of a CPAP machine, and he sleeps through the night, except to get up to use the bathroom. He said he tries as often as possible to do the home exercises that his physical therapist recommended. He stated that he tries to do them in the shower, which relaxes his muscles and gives him more flexibility. (Tr. 49). He is able to take care of his personal needs, such as dressing, bathing and grooming. (Tr. 49-50).

Forest testified that he sometimes helps with household chores, but that his back and legs hurt when he does. He said he does the vacuuming with a lightweight vacuum cleaner, which is easier than the heavy vacuum cleaner that he used to use. He stated that he must take a 15 to 20 minute break after he does any task and that he does things like vacuuming, cooking, washing clothes, emptying the dishwasher and putting away the groceries. (Tr. 50). He said he cannot lift anything too heavy, so he will put away as much of the groceries as he can, take a break and then finish the task. (Tr. 50-51). He testified that he had done the yard work during the past year, but that he intended to have

his sons do it this year. He said that he has a driver's license and drove himself to the hearing.

Plaintiff stated that he could stand for about 15 to 20 minutes before he starts looking for a chair or wall to lean on, because the pain is not as bad if he does this. (Tr. 51). He testified that the pain from standing was primarily in his right hip but also in his left knee, depending on how he shifts his body weight to stand on one or the other leg. He stated that his right knee is also painful. (Tr. 52). He said he can only shift his weight from one leg to the other for a little while before he needs to sit or lie down on the floor for 15 to 30 minutes. (Tr. 52-53). He stated that he lies down on the floor for 15 to 30 minutes four to five times a day.

Forest testified that he can walk about two blocks before he has to take a break because of pain in his hip, knees and right ankle. (Tr. 53). He said that, the longer he walks, the more his right foot will drag and he will stumble a lot, especially on uneven ground, because he does not pick up his right leg as high as he should. (Tr. 53-54). He stated that he cannot climb stairs on a regular basis because climbing stairs makes his knees, foot, ankle and hip hurt. He said that he lives in a one-story house. He testified that he could carry "a carton of cold drinks, or some milk" from the car to the kitchen, a distance of 35 feet, if he broke it up into two trips, and then he would have to sit for a

little while.  (Tr. 54-55).  He stated that he could lift a gallon of milk, but could not lift more than 15 to 20 pounds at a time.

Plaintiff said he could not sit for more than 20 to 30 minutes without pain in his hip.  He stated that his right hip was painful while sitting at the hearing and his right ankle was tingling.  (Tr. 55).  He testified that he feels pain "more all throughout" when he stands.

Forest said he cannot remember certain things since he had his stroke in 2000.  He stated that he was able to go back to work after the stroke because he had good friends who "huddled around me and helped me out."  He testified that he had some trouble remembering steps to solve a problem at work, but "we all fed off of one another." (Tr. 56).  He said that when he first went back to work, he could not remember the names of friends.

Plaintiff testified that he has pain in his hip, leg and ankle every day, but the pain fluctuates sometimes from 15 minutes to a couple of hours.  He stated that nothing in particular triggers the pain, which could start when he is sitting, stands up or walks to the mailbox.  (Tr. 57).  He said he also has pain between his shoulder blades and that his whole body "cracks" when he sits down.  He testified that he experiences pain daily at a level of eight or nine on a ten-point scale.  (Tr. 58).  He stated that sometimes he takes ibuprofen or Advil for pain and that he does not have any prescription medication for

pain. (Tr. 58-59). He said he mentioned this level of pain to Dr. Whitecloud at Tulane Lakeside, but he only saw Dr. Whitecloud once in the fall of 2009 for x-rays and a referral to physical therapy. (Tr. 59).

Forest testified that he did not complete his physical therapy regimen because he started to receive bills for it, the insurance company was not paying for it and he stopped going while he and his wife tried to find out why the insurance did not cover the bills. He said he does the home exercises that his therapist gave him, but does not do them very often in a week. He stated that he mostly does them in the shower because the hot water helps to relax his muscles. (Tr. 60). He said he does an exercise standing against the wall in the shower to stretch the Achilles heel and lower calf muscle, then most of the time he follows it by lying on the floor and stretching his knee across his body to help align the hip. (Tr. 60-61). He stated that the therapist gave him "a bunch" of stooping and pressing exercises, using the wall and a chair, which is basically the same as the exercise he does in the shower. He said the therapist told him that his foot drags because it does not have enough flexibility and his Achilles tendon is so tight that it does not release the way it should. He stated that the exercise he does the most is to try to release the Achilles tendon on his right side. (Tr. 61).

Plaintiff also said he does a stooping exercise by the wall, where he stoops and then raises himself. He testified that sometimes he sits in a chair and raises his arms to

stretch his spine for the pain in his back.  He said his exercises have given him relief.  He stated that he lies on the floor, puts his right leg across his left leg and pulls on the leg to shift and stretch his hip.  (Tr. 62).  He testified that sometimes he lies on the floor and elevates his feet above his heart because his knee and ankle swell from time to time, which is not an exercise that the physical therapist gave him.  He said he has a whole folder full of sheets of paper with exercises that she gave him.

Forest stated that he lies on the floor with his feet elevated for an hour or two and that, if he does so every day, his leg swelling goes down.  He said the stooping exercises occasionally help relieve the pain in his lower back and hip.  He testified that the exercises he does the most are lying on the floor with his feet elevated on the sofa, and taking his right leg and raising it across to stretch the hip.  (Tr. 63).  He stated that the exercises have not really relieved the weakness in both legs, but they help occasionally.  He said he does not lie on the floor four to five times a day, but will lie down on the couch, bed or chair and ottoman.  He testified that he does his stooping and heel-lifting exercises twice a day, once at night when he takes his shower and once in the afternoon when his mother takes her nap.  (Tr. 64).  He then said he does the exercises from time to time, not twice daily, and does them when he does not have anything else to do that day, such as emptying the dishwasher.  He finally stated that he does the exercises about eight times per week.  (Tr. 65).

13

Plaintiff testified that he was tested for sleep apnea in a sleep study and that he uses a mask and oxygen machine every night, which helps him sleep. He said his wife told him that he would stop breathing without the machine. He stated that he sleeps through the night with the machine, except when he gets up to use the bathroom, but then he goes right back to sleep. (Tr. 66-67).

Forest said his right leg is smaller and less muscular than his left leg. (Tr. 67). He stated that his left leg swells, but is not bruised, and is larger because he has carried his weight on that side most of his life. He said he gets fluid in the left leg from time to time and it swells about once every week or two. He denied having any bruising on his body. (Tr. 68-69).

Plaintiff stated that he takes one pill daily for his blood pressure and that it helps, although it causes him to have to use the bathroom. (Tr. 69-70). Because of this, he said he "fluctuates" with the time of day that he takes it. For example, he testified that he will not take it if he knows he will be going "out to do a chore or something," and will take it in the afternoon instead of the morning, when he normally takes it. He stated that he takes it daily, but sometimes he forgets to take it. (Tr. 70). He testified that he worked around men all his life, so he would joke with the female nurses at his doctor's office that his blood pressure was high when they took it. He thought that his medical records reflected high blood pressure from time to time because of this. When the ALJ

questioned him about the Tulane medical records that showed his blood pressure was barely controlled on a regular basis, Forest said his doctor changed his medication about one year ago. He testified that his blood pressure still fluctuates but that the new medication has helped, if he remembers to take it daily. He said his pressure is high if he forgets to take his pill in the morning.

Plaintiff stated that he does not regulate his diet as he should because of his high blood pressure. He said he eats pork chops, beef, barbecue ribs, red beans and rice with pickle chips and pig tails. (Tr. 70-71). He testified that he knows these foods cause his blood pressure to go up.

Forest said that his right-handed weakness resolved after his stroke, but he still has weakness in his right leg because it is smaller than the left. He stated that he takes potassium pills, vitamins, "diazinon"[4] and some others. He said that his wife keeps track of his medications and that he takes eight pills a day, plus a baby aspirin. He testified that Dr. Cooper referred him to Dr. Whitecloud because every time he saw Dr. Cooper, which was about once a month, he told her that his leg and hip hurt. He reiterated that he only saw Dr. Whitecloud once and that Dr. Whitecloud referred him to physical therapy. (Tr. 73).

---

[4]Diazinon is a pesticide. This probably should be dyazide (hydrochlorothiazide, a diuretic), which is on plaintiff's medications list. (Tr. 163).

C.   Vocational Expert Testimony

A vocational expert, Deborah A. Bailey, testified at the hearing that plaintiff's past relevant work as a bus mechanic was skilled work at a medium exertional level. The ALJ posed a hypothetical of an individual with plaintiff's age, education and past relevant work who can perform light work with the ability to stand and/or walk for six out of eight hours and to sit for two out of eight hours, with normal breaks. The job should allow for sitting and standing. The hypothetical person could occasionally climb stairs and ramps, but could not kneel, crawl, climb ladders or ropes, operate left foot controls or be exposed to extreme heat or cold. (Tr. 75).

Bailey testified that such a person could not perform plaintiff's past relevant work. (Tr. 75-76). She stated that Forest had transferable skills from his past relevant work, namely, the ability to work to precise measurements, knowledge of tools and equipment related to the trade, planning work procedures by using charts and technical manuals and knowledge of electronic and electrical components to repair mechanical equipment. (Tr. 76-77). She testified that the skills to work to precise measurements were transferable to assembly type work.

Bailey stated that most light work requires being on your feet for two-thirds of the day, but some assembly type work would allow for alternating sitting and standing, and would still be designated as light based on the lifting requirement. (Tr. 77-78). She

testified that the hypothetical person could perform the job of assembler, which has hundreds of DOT titles under that general heading. (Tr. 78). She stated that she decreased by one-half the numbers of available jobs at the light level to account for the opportunity to change positions and that a semi-skilled assembler job would fit the hypothetical. Bailey testified that there were no skilled jobs with transferable skills from the past relevant work because the skilled jobs would be at the heavy exertional level and that the semi-skilled assembler job is the only one that fits with the transferable skills and is available in significant numbers in the state and national economies. (Tr. 79-80). She stated that, in the unskilled category, the hypothetical individual could perform the light exertional level jobs of counter clerk and information clerk, which are both available in significant numbers in the state and national economies. (Tr. 81).

The ALJ noted that, if the exertional level was reduced to sedentary, the grid rule would apply in the instant case. Plaintiff's attorney agreed with that statement.

Plaintiff's attorney then modified the first hypothetical to include the need, because of pain that is increased by work activity, to take a daily 30 to 60 minute break in addition to the ordinary two 15-minute breaks and 30-minute lunch hour. Bailey testified that this restriction would eliminate all work. (Tr. 82-83).

D.   Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 16-23).  I find the ALJ's summary of the medical evidence substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

E.   Plaintiff's Appeal

1.   The ALJ applied the correct legal standard to determine that plaintiff's impairments did not meet or equal Listing 1.02(A).

Forest argues that the ALJ failed to apply the correct legal standard when determining that his impairments did not meet or equal Listing 1.02(A) for major dysfunction of a weight-bearing joint.  At step three of the sequential evaluation, the ALJ held that plaintiff's impairments did not meet or equal any listed impairment.  The ALJ stated that she had "considered the criteria required by the listings but found that none of the claimant's impairments (whether considered singly or in combination) are attended with the specific signs and diagnostic findings required to meet or equal" any listing.  (Tr. 17).  Plaintiff contends that the ALJ's generic statement in this regard and her failure to discuss Listing 1.02(A) specifically were reversible error.  He asserts that the medical evidence demonstrates that he meets or equals Listing 1.02(A).

Whether an impairment or combination of impairments meets a listing is a medical question that can be answered <u>only</u> by medical evidence. 20 C.F.R. §§ 404.1526(b), 416.926(b); <u>McCuller v. Barnhart</u>, 72 F. App'x 155, 158 (5th Cir. 2003); <u>Selders v. Sullivan</u>, 914 F.2d 614, 619 (5th Cir. 1990); <u>McKnight v. Astrue</u>, No. 07-1654, 2008 WL 4387114, at *3 (W.D. La. Aug 15, 2008), <u>report & recommendation adopted</u>, 2008 WL 5746939 (W.D. La. Sept. 23, 2008), <u>aff'd</u>, 340 F. App'x 176 (5th Cir. 2009).

"The specified medical criteria [of a listing] are designed to be demanding and stringent because they lead to a presumption of disability[,] making further inquiry unnecessary." <u>Anderson v. Astrue</u>, No. 3:11-CV-0051-K-BH, 2011 WL 3331821, at *6 (N.D. Tex. July 11, 2011), <u>report & recommendation adopted</u>, 2011 WL 3347857 (N.D. Tex. July 29, 2011) (citing <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990); <u>Falco</u>, 27 F.3d at 162). "'Whether the findings for an individual's impairment meet the requirements of an impairment in the listings is usually more a question of medical fact than a question of medical opinion. . . . In most instances, the requirements of listed impairments are objective, and whether an individual's impairment manifests these requirements is simply a matter of documentation.'" <u>Avery v. Astrue</u>, 313 F. App'x 114, 121 (10th Cir. 2009) (quoting SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996)).

"For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present

medical findings equal in severity to <u>all</u> the criteria for the one most similar listed impairment." <u>Zebley</u>, 493 U.S. at 5301 (citing 20 C.F.R. § 416.926(a); SSR 83-19, at 91) (emphasis in original).

"An impairment that manifests only some of the requisite criteria, no matter how severely, does not qualify. If the plaintiff fails to demonstrate the specified medical criteria, the court will find that substantial evidence supports the ALJ's finding that listings-level impairments are not present." <u>Gewin v. Astrue</u>, No. 10-1008, 2011 WL 3924232, at *3 (W.D. La. Aug. 3, 2011), <u>report & recommendation adopted</u>, 2011 WL 3954877 (W.D. La. Sept. 6, 2011) (citing <u>Zebley</u>, 493 U.S. at 530-31; <u>Selders</u>, 914 F.2d at 620); <u>accord</u> <u>Taylor v. Astrue</u>, No. 3-10-CV-1158-O-BD, 2011 WL 4091506, at *8 (N.D. Tex. June 27, 2011), <u>report & recommendation adopted</u>, 2011 WL 4091503 (N.D. Tex. Sept. 14, 2011).

Thus, Forest must identify specific medical evidence demonstrating that he meets or medically equals <u>all</u> the criteria of Listing 1.02(A). Listing 1.02(A) provides as follows:

> 1.02 Major dysfunction of a joint(s) (due to any cause): Characterized by [1] gross anatomical deformity (e.g., subluxation,[5] contracture,[6] bony or

---

[5]Subluxation is "an incomplete or partial dislocation." <u>Dorland's</u> at 1719.

[6]Contracture is "a condition of fixed high resistance to passive stretch of a muscle, resulting from fibrosis of the tissues supporting the muscles or the joints, or from disorders of the muscle fibers." <u>Id.</u>

fibrous ankylosis,[7] instability) and [2] chronic joint pain and stiffness with [3] signs of limitation of motion or other abnormal motion of <u>the affected joint(s), and</u> [4] findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of <u>the affected joint(s)</u>. <u>With</u>:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in <u>inability to ambulate effectively</u>, as defined in 1.00B2b . . . .

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A) (emphasis and bracketed numbers added).

The first paragraph of the listing thus requires proof of four elements: (1) a gross anatomical deformity in a joint, (2) chronic joint pain and stiffness, (3) limitation of motion or other abnormal motion <u>and</u> (4) findings from medically acceptable imaging.

In addition to establishing all four of those elements, plaintiff must show that he satisfies subparagraph (A) of the listing by meeting the Section 1.00(B)(2)(b) definition of "inability to ambulate effectively." That section provides:

(1) Definition. Inability to ambulate effectively means an <u>extreme limitation of the ability to walk</u>; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as <u>having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities</u>. . . .

(2) To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without

_____

at 398.

[7]Ankylosis is the "immobility and consolidation of a joint." <u>Id.</u> at 91.

companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Id. § 1.00(B)(2)(b) (emphasis added).

In Bullock v. Astrue, 277 F. App'x 325 (5th Cir. 2007), which also involved Listing 1.02(A), the Fifth Circuit refused to accept the argument that Forest makes here: that an ALJ must always explain in detail her reasons for finding that a claimant does not meet a listing.

Bullock asserts that the ALJ erred at step three of the five-step process by failing to explain why her impairment did not meet listing 1.02(A) under the Listing of Impairments. Bullock cites no binding authority for the contention that the ALJ is required to articulate the reasons supporting his finding under step three. Thus, the sole question before this court is whether substantial evidence supports the ALJ's finding that Bullock did not have an impairment under [the listing].

Id. at 327-28 (citing Selders, 914 F.2d at 614). Like Bullock, Forest cites no binding authority, and my research has located none, that requires the ALJ to articulate with greater specificity her reasons for rejecting his argument (made at the hearing) that he meets Listing 1.02(A).

Even if the ALJ erred by failing to discuss the listing specifically, the error is harmless, unless Forest can point to substantial medical evidence that he meets the listing. An ALJ's failure to explain her step three findings "does not require remand unless the claimant's 'substantial rights' were affected. A claimant's substantial rights are affected at Step 3 when he demonstrates that he meets, or at least appears to meet, the requirements for a Listing. In other words, the ALJ's error may be harmless." Reynolds v. Astrue, No. 1:08cv228-SAA, 2010 WL 583918, at *6 (N.D. Miss. Feb. 16, 2010) (citing Audler v. Astrue, 501 F.3d 446, 448 (5th Cir. 2007); Morris v. Bowen, 864 F.2d 333, 334 (5th Cir. 2007)); accord Tolliver v. Astrue, No. 6:09-cv-0135, 2010 WL 3522396, at *6 (W.D. La. July 29, 2010), report & recommendation adopted, 2010 WL 3522502 (W.D. La. Aug. 31, 2010).

Plaintiff has failed to identify substantial evidence to establish that he meets all the criteria of Listing 1.02(A). He contends that he meets the four criteria of the first paragraph of the listing based on the diagnoses and clinical findings concerning his right foot, right hip and both knees. In his memorandum, plaintiff combines all of these various clinical findings to argue that he meets the listing criteria. Thus, Forest cites his diagnosis of plantar flexion[8] contracture in his right foot with findings of decreased

---

[8]Plantar flexion is the "bending of the toes or foot downward toward the sole." Dorland's at 1397.

strength in the right ankle; x-ray findings of osteoporosis[9] and physical findings of decreased strength in his right hip; physical findings of hyperextension,[10] decreased range of motion and decreased strength in his right knee; and x-ray findings of marked narrowing of the joint space of the medial compartment with spurring of the patella (knee cap) and hypertrophy[11] in his left knee.

Initially, it must be noted that many of the records on which plaintiff relies in his attempt to establish the criteria of Listing 1.02 are physical therapy progress notes. However, a physical therapist is <u>not</u> an acceptable medical source to "provide evidence to <u>establish</u> an impairment." 20 C.F.R. § 404.1513(a) (emphasis added). Although the ALJ did not discuss the weight she gave to the physical therapist's findings, it is well established that a physical therapist

> is an "other" medical source, rather than an "acceptable medical source." 20 C.F.R. § 404.1513(d)(1) & 416.913(d)(1). This distinction is material because only "acceptable medical sources" can provide "medical opinions" to show the severity of a claimant's impairment and how it affects her functional ability. 20 C.F.R. § 1527(a)(2) & 416.927(a)(2). Although the ALJ is required to consider evidence from "other sources" when evaluating

---

[9]Osteoporosis is a "reduction in the amount of bone mass, leading to fractures after minimal trauma." <u>Id.</u> at 1290.

[10]Hyperextension is the "extreme or excessive extension of a limb or part." <u>Id.</u> at 850. Extension is "the movement that straightens or increases the angle between the bones or parts of the body." <u>Id.</u> at 636.

[11]Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." <u>Id.</u> at 859.

an "acceptable medical source's" opinion, "the fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' because . . . 'acceptable medical sources' 'are the most qualified health care professionals.'"

Patterson v. Astrue, No. 10-0600, 2011 WL 6157475, at *8 (W.D. La. Apr. 13, 2011)

report & recommendation adopted, 2011 WL 2294807 (W.D. La. June 8, 2011) (quoting

SSR 06-03p, 2006 WL 2329939 (Aug. 9, 2006)) (citing Griego v. Sullivan, 940 F.2d 942,

945 (5th Cir. 1991); Reynolds, 2010 WL 583918, at *1); accord Thibodeaux v. Astrue,

324 F. App'x 440, 445 (5th Cir. 2009) (social worker therapist's opinion is entitled to

less deference than psychiatrist's opinion).

Thus, to the extent that the findings of plaintiff's physical therapist are either

contradicted or unsupported by the opinions of Jan A. Cooper, M.D.,[12] plaintiff's treating

physician; Jacques S. Whitecloud, the orthopedist[13] who examined plaintiff once and

referred him to physical therapy; and Miljana Mandich, M.D., the internist who examined

Forest at the request of the Commissioner, the ALJ was justified in according greater

---

[12]Although plaintiff's medical records do not indicate Dr. Cooper's specialty, the Tulane Medical Center website states that she is an "Associate Professor of Medicine, Department of Medicine, Section of General Internal Medicine and Geriatrics." http://tulanehealthcare.com/physicians/profile/Jan-A-Cooper-MD (visited on July 26, 2012).

[13]Plaintiff's medical records do not indicate Dr. Whitecloud's specialty, but the Tulane Medical Center website states that he is an "Assistant Professor of Clinical Orthopaedics, Tulane University School of Medicine, Department of Orthopedics, Section of Orthopedic Surgery." http://tulanehealthcare.com/physicians/profile/Jacques-S-Whitecloud-MD (visited on July 26, 2012).

weight to the doctors' findings than to those of the therapist. Perschka v. Comm'r of Soc. Sec., 411 F. App'x 781, 787 (6th Cir. 2010); Thornton v. Astrue, 337 F. App'x 600, 602 (8th Cir. 2009); Leval v. Comm'r of Soc. Sec., No. 11-0001, 2012 WL 1123839, at *1 n.1 (W.D. La. Mar. 13, 2012), report & recommendation adopted, 2012 WL 1123835 (W.D. La. Apr. 3, 2012) (citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996)).

The medical evidence does not establish the entire set of four, first-paragraph criteria in any one of Forest's major weight-bearing joints. Listing 1.02 acknowledges the possibility that more than one joint may satisfy its criteria when it refers to "major dysfunction of a joint(s)" and "the affected joint(s)" (emphasis added). However, a reasonable reading of the plain language of the paragraph as a whole, with its repetition of the subsidiary phrase "of the affected [joint or] joint(s)" in both its third and fourth elements, can only logically mean that the entire constellation of four objective findings must exist in at least one "of the affected joint(s)."

I assume without deciding that the record contains substantial medical evidence that Forest has chronic joint pain and stiffness in each of the four major weight-bearing joints about which he complains, which satisfies the second requirement of Listing 1.02 as to each joint. However, the medical evidence does not show that the other three requirements are satisfied as to any one joint. Plaintiff has a diagnosis of plantar flexion contracture in his right foot and decreased range of motion in his right ankle, but there

is no medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of "the affected joint," i.e., the right ankle. Therefore, his right ankle does not meet the fourth requirement of the first paragraph of Listing 1.02. Although Forest has x-ray findings of marked narrowing of the joint space in his left knee (Tr. 246), there is no evidence of gross anatomical deformity in that affected joint. The left knee thus does not meet the first requirement of the listing. The medical records contain evidence of decreased range of motion in plaintiff's right knee, but no medically acceptable imaging of joint space narrowing, bony destruction or ankylosis of that knee. Therefore, he does not meet the fourth requirement of Listing 1.02 in his right knee.

Plaintiff's right hip is the only joint that arguably meets all four criteria of the first paragraph of Listing 1.02. He has a diagnosis of osteoporosis, which perhaps qualifies as "bony destruction," documented by x-ray on September 3, 2009, although the same x-ray report stated that his joint space is well preserved. (Tr. 246). He thus may meet the fourth requirement. According to the notes of his initial physical therapy evaluation on September 9, 2009, he had reduced range of motion in the right hip, which meets the third requirement of the paragraph. The physical therapist also observed, as to plaintiff's balance, "right SLS [single limb support] poor 2-3 sec[onds]." (Tr. 288). The record is not clear if this evidence of right-sided instability is in the hip, knee or ankle. If it is in the right hip, it may be sufficient to meet the first requirement of Listing 1.02. On the

other hand, none of Forest's treating or examining physicians documented any instability in his right hip.

Substantial evidence supports the ALJ's conclusion that plaintiff does not meet the listing. Even if he met the requirements of the first paragraph of Listing 1.02, he does not have an extreme limitation of his ability to walk, as defined by Listing 1.02(A) and 1.00(B)(2)(b). He relies on the physical therapy notes from September 9, 2009, that he had an antalgic gait with decreases in his step length, range of motion, strength, balance and weight-bearing capacity in the right leg. (Tr. 288-90). He also cites his physical therapist's notes on December 10, 2009, when he complained that his "whole body has hurt," especially his left knee and right ankle, since he had gone up and down a ladder to hang Christmas lights the previous week. His therapist "instructed [him] in performing tasks in parts rather [than] completing entire task at once to avoid irritation. . . . Modification in breaking up tasks would be beneficial." (Tr. 305). Plaintiff relies on this instruction as evidence that he cannot ambulate effectively. This evidence, even if it were accorded the weight of an acceptable medical source, does not meet the regulatory definition.

There is no evidence that Forest requires the use of a hand-held assistive device, such as a walker or two canes, that limits the functioning of both upper extremities. Indeed, there is no evidence that he uses any assistive device to walk. Nor does the

28

medical record support a conclusion that he is unable to walk a block at a reasonable pace or carry out routine ambulatory activities, such as shopping and banking.

At a physical examination on August 26, 2009, Dr. Whitecloud observed that, despite plantar flexion contracture and exaggerated reflexes in the right leg, Forest could dorsiflex both feet, "had no tenderness over the medial joint line on the right" knee, had "minimal tenderness" on the left, "has only crepitus [in his left knee] without any other mechanical or locking symptoms" and his "[w]alking tolerance is not limited at all." (Tr. 298). At a consultative examination on September 17, 2009, Dr. Mandich noted that Forest "ambulates without difficulty, without a limp or use of a cane. . . . The patient ambulates without self support and . . . can walk on heels and toes and squat about halfway down and rise without support." (Tr. 249).

Plaintiff's physical therapist documented on October 19, 2009, that he was "up in his attic all day on Saturday installing surround sound," during which he "had to walk on rafters and squat" (Tr. 284), and that he was able go up and down a ladder repeatedly to hang Christmas lights on December 10, 2009. (Tr. 305). Forest himself testified that he can walk about two blocks, vacuums, cooks, washes clothes, empties the dishwasher, puts away the groceries and had done the yard work during the year before the hearing, which was two years after his alleged onset date. These activities are inconsistent with an extreme limitation of the ability to walk. See Bullock, 277 F. App'x at 328 ("[E]ven

29

if Bullock met the requirements of 1.02(A), Bullock would also have to show that she is unable to ambulate effectively as described in Listing 1.00(B)(2)(b), which is also not supported by the record. The record indicates that Bullock is able to walk with the help of a single cane, not a walker, two crutches or two canes. Bullock has indicated that she is able to climb stairs with the use of a handrail and at her last documented visit to a physician, . . . she indicated that she [is] able to walk two blocks at a time.").

The evidence is therefore insufficient to demonstrate that Forest met or medically equaled the objective criteria of Listing 1.02(A). To the extent that his physical limitations, pain and diagnoses contributed to functional restrictions, the ALJ addressed such limitations at step four of the sequential evaluation. Accordingly, plaintiff's first assignment of error lacks merit.

> 2.      The ALJ did not err by failing to obtain an updated medical expert opinion regarding medical equivalency.

Forest argues that Social Security Ruling 96-6p, 1996 WL 374180 (July 2, 1996), and 20 C.F.R. § 404.1527(f)(2) (which is now 20 C.F.R. § 404.1527(e)(2)(iii)), required the ALJ to obtain an updated medical expert opinion because additional medical evidence was received after the State agency medical consultant's review, which could modify the consultant's finding that plaintiff's impairment was not equivalent in severity to any impairment in the listings. This assignment of error lacks merit.

The cited regulation and ruling are clear that an ALJ "may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart." 20 C.F.R. § 404.1527(e)(2)(iii) (emphasis added). But the ALJ is not required to do so when additional medical evidence is received, unless, in the ALJ's "opinion," SSR 96-6p, 1996 WL 374180, at *4 (emphasis added), the new evidence "may change the State agency medical consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." Id. Social Security Ruling 96-6p "requires an ALJ to obtain an updated medical opinion from a medical expert when, in the opinion of the ALJ, the evidence in the record suggests that 'a judgment of equivalence may be reasonable.'" Tessitore v. Apfel, No. 97-2925, 1998 WL 564292, at *2 (E.D. La. 1998) (Vance, J.) (quoting SSR 96-6p, 1996 WL 374180 at *4) (citation omitted).

In the instant case, the agency medical consultant, Anthony Scardino, M.D., completed a Physical Residual Functional Capacity Assessment on September 23, 2009, in which he opined, based on a review of the medical records to date, that plaintiff was capable of light work. (Tr. 252-59). The ALJ reviewed the evidence received after that date, found that "it does not substantially impact these state agency opinions" (Tr. 22), but nonetheless accorded the opinion "little weight" because she found that Forest "is

31

somewhat more limited in his ability and can not perform a full wide range of light work . . . ." (Tr. 23).

I find that the ALJ's review of the medical records was both thorough and accurate. "Accordingly, a decision that the record did not 'suggest a judgment of equivalence may be reasonable' is supported by substantial evidence." Tessitore, 1998 WL 564292, at *2; see also Asberry v. Astrue, No. H-07-4522, 2008 WL 4057860, at *9 (S.D. Tex. Aug. 26, 2008) (citing 20 C.F.R. § 1.00(B)(2)(b)(2)) (New evidence in the record showed that plaintiff had been prescribed a single cane. "According to the regulations, if a person can walk with a single cane, she is ambulatory. This evidence does not raise an issue of medical equivalence to the Listings requiring expert testimony. Moreover, Plaintiff herself testified that she was able to walk half a block, stand for thirty minutes, and sit. . . . It was not error for the ALJ to have concluded that improvement in Plaintiff's ability to ambulate would only serve to reinforce, not change, the opinion of the state medical consultant.").

      3.    Substantial evidence supports the ALJ's finding that plaintiff can perform sustained work activities.

At the fourth step of the sequential evaluation, the ALJ found that Forest has the residual functional capacity to perform light work, except that he must be able to shift from sitting to standing at will; cannot climb ladders or ropes, kneel, crawl or operate

foot controls with his left foot; is precluded from exposure to extreme heat or cold; and can occasionally crouch and climb stairs and ramps. Forest argues that the ALJ erred by finding that he can perform sustained work activities and failing to discuss "specific instructions from treating sources in the record" that he should perform tasks in parts to avoid irritation and that breaking up tasks would be beneficial. Plaintiff's memorandum, Record Doc. No. 15-3 at p. 10. He also contends that he would have continued to perform his job as a bus mechanic, after nearly 30 years on the job, if he had been capable of maintaining a 40-hour work week. Id. at 10.

As previously discussed, the instruction to break up tasks was given by a physical therapist, who is not a medically acceptable source. Even if the instruction is given some weight, it was given only once as a result of plaintiff's choice, two and one-half years after he allegedly became disabled by hip and knee pain, to climb a ladder repeatedly to hang Christmas lights. (Tr. at 305). No other such instruction appears in the record. No physician placed any restrictions on Forest's activities or opined that he is incapable of performing sustained work activity at less than the full range of light work, with the limitations that the ALJ found.

Plaintiff's argument that he would have continued working, but for his disability, is belied by the medical records and his own testimony. During his initial visit to his internist, Dr. Cooper, in March 27, 2007, Forest told her that he was doing well overall

and that he planned to retire in July 2007. Forest did not say that he was retiring because he was physically unable to work, and he did not mention any musculoskeletal complaints. (Tr. 235). On October 9, 2007, four months after his alleged onset date, he reported to Dr. Cooper that he had retired and was doing fairly well overall. Again, no musculoskeletal complaints were noted. (Tr. 233). Plaintiff told Dr. Mandich on September 17, 2009 that he had "worked for RTA as a mechanic for thirty years and retired in July of 2007." Again, he did not say that he retired because of his lower extremity pain and weakness. (Tr. 248). Forest testified that he retired in part because he could no longer do the heavy lifting by himself, but he also said he retired because of Hurricane Katrina and because he needed to take care of his 85-year old mother, who was now living with him. He stated that he had not tried to work since retiring. (Tr. 44-45). This evidence indicates that he retired for reasons unrelated to his lower extremity pain and weakness.

Plaintiff's testimony that he could not work <u>as a bus mechanic</u> because he could no longer lift heavy objects was taken into account by the ALJ in her residual functional capacity assessment that he could perform less than the full range of light work and her finding, based on the vocational expert testimony, that he could not return to his past relevant work, which was at the medium exertional level. Plaintiff's testimony about his

inability to lift heavy objects does not preclude him from working at lower exertional levels.

Plaintiff saw Dr. Cooper on February 15, 2008, who again noted that Forest was doing well overall. He had some issues with his blood pressure, but no other complaints. (Tr. 229). At his next visit on May 22, 2008, almost a year after his alleged onset date, he reported for the first time some left knee discomfort, for which he took Tylenol and intended to get a brace. No other musculoskeletal complaints were noted. (Tr. 227). Dr. Cooper continued to state that plaintiff was doing well overall on October 28, 2008 and November 25, 2008. (Tr. 223, 225). On the latter date, Dr. Cooper noted that Forest had intermittent knee pain, which needed no intervention. (Tr. 223). Similarly, on April 28, 2009, Dr. Cooper said that Forest "continues to have some arthritic complaints, [but] does not wish anything done about them." (Tr. 220). He did not seek any treatment for his musculoskeletal problems until he saw Dr. Whitecloud on August 26, 2009 (Tr. 298), more than two years after he retired, less than three months after he filed his application for DIB and less than a month before his consultative examination by Dr. Mandich. At that time and for the next three months, his only treatment was physical therapy. The physical therapist's notes indicate that he improved with treatment, when he was compliant with it, which he was not always. (Tr. 303-08).

When Dr. Mandich examined Forest on September 17, 2009, Forest ambulated without difficulty and had a normal gait.  Physical examination revealed normal range of motion of the neck and lower back, with complaints of pain in the right sacroiliac joint area and the side of the right hip.  Plaintiff could walk on heels and toes, squat about halfway down and rise without support.  All peripheral pulses, muscle tone, strength and neurological examination were normal.  Range of motion was normal in all extremities, except that Forest had mildly limited flexion in both knees.  Dr. Mandich suspected mild chronic stasis edema or lymphedema[14] in plaintiff's left leg.  (Tr. 249-51).

Dr. Cooper continued to note that plaintiff was doing well overall and had no complaints on October 2, 2009 and January 8, 2010.  (Tr. 296, 301).  She found nothing remarkable on physical examination of his extremities on January 8, 2010.  (Tr. 301).  Every one of Dr. Cooper's progress notes contradicts plaintiff's testimony that he told her at every visit about his hip, knee and ankle pain.

A claimant's lack of need for prescription medication and/or failure to seek treatment is a relevant factor to consider in determining the severity of an alleged

---

[14]Venous stasis means "cessation or impairment of venous flow, such as with venous insufficiency."  Dorland's at 1695.  Venous insufficiency means "inadequacy of the venous valves and impairment of venous return from the legs (venous stasis), often with edema and sometimes with stasis ulcers at the ankle."  Id. at 904.  Lymphedema means "chronic unilateral or bilateral edema of the extremities due to accumulation of interstitial fluid as a result of stasis of lymph, which is secondary to obstruction of lymph vessels or disorders of the lymph nodes."  Id. at 1036.

impairment and may be used in conjunction with the medical reports to discount plaintiff's complaints of disabling pain or other limitations.  Doss v. Barnhart, 137 F. App'x 689, 690 (5th Cir. 2005); Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992); Griego v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Villa v. Sullivan, 895 F.2d 1019, 1024 (5th Cir. 1990).

Accordingly, this assignment of error lacks merit.

4.    The ALJ applied the correct legal standard when determining plaintiff's residual functional capacity and her finding is supported by substantial evidence.

Forest argues that the ALJ should not have relied on the findings of the non-examining medical consultant, Dr. Scardino, when she found that plaintiff "has the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b) except that he must be able to shift from sitting to standing at will," with the additional restrictions that he can crouch and climb stairs and ramps occasionally, but cannot climb ladders or ropes, kneel, or crawl.  (Tr. 17).  Forest erroneously states that the ALJ held that he "must be able to walk and/or stand for six hours per day."   Plaintiff's memorandum, Record Doc. No. 15-3, at p. 11.  He contends that such a finding is based on Dr. Scardino's residual functional capacity assessment (Tr. 252-59) and that substantial evidence does not support that assessment.

Not only did the ALJ <u>not</u> find that Forest must be able to stand and/or walk for six hours per day, but the definition of light work does not require it. Light work is defined as work that requires "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). When Dr. Scardino reviewed plaintiff's medical records on September 23, 2009, he found that Forest could stand and/or walk (with normal breaks) for about six hours in an eight-hour work day, could sit (with normal breaks) for about six hours in an eight-hour work day and could frequently balance, stoop, kneel, crouch and crawl. (Tr. 253). Based on these findings, he opined that plaintiff was capable of the full range of light work. (Tr. 259).

Contrary to plaintiff's argument, the ALJ accorded Dr. Scardino's opinion "little weight" because she found that Forest "is somewhat more limited in his ability and can not perform a full wide range of light work . . . ." (Tr. 23). She placed more severe restrictions on Forest's capabilities, including that he must be able to shift from sitting to standing at will (not stand for six hours, as Dr. Scardino opined), can crouch and climb stairs and ramps only occasionally (not frequently), and can never climb, kneel or crawl (not frequently).

The ALJ's review of the medical records was thorough and accurate. Her residual functional capacity findings are supported by substantial medical evidence, as discussed in more detail in the preceding sections of this report and recommendation, and by the vocational expert's testimony that a person with plaintiff's age, education, work experience and functional limitations could perform the job of assembler. Accordingly, this assignment of error lacks merit.

## CONCLUSION

The ALJ applied the correct legal standard when determining that plaintiff's impairments did not meet or equal Listing 1.02(A) and substantial evidence supports that conclusion. The ALJ did not err by failing to obtain an updated medical expert opinion regarding medical equivalency. Substantial evidence supports a finding that plaintiff can perform sustained work activities. The ALJ applied the correct legal standard when determining plaintiff's residual functional capacity and her findings are supported by substantial evidence.

## **RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen

(14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[15]

New Orleans, Louisiana, this _____31st_____ day of July, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[15]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.